MEMORANDUM OF DECISION
In her complaint, the plaintiff, Helen Skelton, alleges that she suffered injuries when she slipped and fell in a Stop Shop Supermarket at 72 Newtown Road, in Danbury, Connecticut, on April 13, 1995. The case was tried before the court on November 21 and 30, 2000.
There was no eyewitness to the fall other than Skelton herself. Her friend, Mr. Giannaras, testified that he, Skelton, and her husband, Erzin, went to the Stop Shop around 10:30 p.m. on April 13 to pick up some items for an Easter holiday meal. Giannaras said he was looking for a cooking syrup at the request of Skelton. While toward the front of the store, Giannaras testified that he heard a thump, turned around and saw Skelton on the aisle floor next to a "pie plate" size pool of clear liquid. Giannaras testified that he had seen the liquid on the floor when he passed by, but had avoided it.
On cross-examination, Giannaras stated he had picked up a jar of syrup off the shelf on that aisle before he heard the thump. When he went back to assist Skelton, he put the jar back on the shelf further toward the front of the store than where he had originally found it.
Shelton testified that while she was in the store, she was looking for a certain type of syrup. When an employee pointed her toward a certain CT Page 2084 aisle, she testified that Giannaras headed down that aisle toward the front of the store; she followed him perhaps a quarter of the aisle length behind. While looking at the products on the shelves, Skelton testified, her right foot slipped on a liquid, and she fell on her back. Skelton testified she hurt her right shoulder, left knee, spinal area and right wrist.
Louis Desena, the night manager on duty at the store, was called to aisle 7 where he saw a woman lying on her back on the floor next to a whitish liquid on the floor which he identified as Karo syrup, the only brand of cooking syrup carried by the store. Desena testified that he was a little suspicious when he did not see any bottle or jar fragments on the aisle floor. After Skelton had been transported to the Danbury Hospital, Desena took two Polaroid pictures of the spill on the floor. Desena also made out a report of the incident.
Garrett Lockwood was the night crew chief at Stop Shop, coming on duty at 11 p.m. He testified that Desena's and his curiosity as to the lack of broken glass prompted him to investigate the aisle 7 shelves, where he found an opened jar of Karo syrup behind mayonnaise jars with two to three ounces of syrup missing.
The court concludes that Skelton has not established by a preponderance of credible evidence: (1) that she accidentally slipped and fell at the Stop Shop, and (2) that Stop Shop had the requisite notice of the allegedly dangerous condition in order to impose liability on it. The reasons for these conclusions and a further discussion of the evidence follow.
 I THE SLIP AND FALL
The court has serious reservations about the veracity of testimony that Skelton slipped on a slippery substance on the Stop Shop floor. These reservations arise from several sources. To begin with, there is the evidence of the opened, partially emptied bottle of Karo syrup which was found placed behind another product on the same aisle. This testimony came from an employee who was not on duty immediately before the incident (and therefore could not be held responsible by his superior) and had no discernible bias or interest in the outcome of this case. The presence of the opened jar and the testimony of Giannaras that he placed a cooking syrup container on the shelves in that area certainly raises suspicions, particularly when this obviously pertinent information was not forthcoming on direct examination. There are also the Polaroid pictures taken by CT Page 2085 Desena which, although taken an hour after the alleged accident and not as clear as one might like, show no evidence of a slip mark.
With respect to Skelton's testimony, there were serious inconsistencies and contradictions, not so much concerning the actual incident, but throughout the evidence she presented, which cast doubt on her accuracy, to say the least. Records from the Danbury Hospital indicate that Skelton told personnel there on the night of the incident that she was three months or ten weeks pregnant. Exhibit 3. She apparently told Dr. Esquibel, a psychiatrist she was seeing, that she was two months pregnant at the time of the accident. Exhibit 4. In fact, Skelton had undergone an abortion on March, 1995, about a month prior to her visit to Stop 
Shop. This therapeutic abortion had been recommended by her orthopedic doctor, Dr. Pirpirus. Exhibit A. For reasons unfathomable to the court, Skelton told Dr. Pirpirus three weeks after the abortion, which he had recommended, that she had chosen not to have the abortion. Id.
There are many inconsistencies and inaccuracies. Eight months prior to the Stop Shop incident, Skelton was involved in an automobile accident in which, allegedly, a parked vehicle in which she was sitting behind the wheel, was hit by another vehicle at a speed of 40 to 50 miles per hour.[1] Following this accident, Skelton visited Pirpirus on numerous occasions, both prior to April, 1995, and after. In the Pirpirus reports submitted in evidence, there are regular references, before the Stop 
Shop incident in April, 1995, of Skelton's complaints about pain in her spinal area and her right shoulder and arm. Exhibit A. The injuries claimed in this case include those two areas. At trial, Skelton testified she was not seeing any health professional at the time of the Stop Shop incident. In fact, she had seen Pirpirus on March 31, 1995, about the injuries received in the 1994 motor vehicle accident. Moreover, she saw him again on May 26, 1995, and his report indicates no complaints about right shoulder or knee and indicates Skelton's condition was unchanged from March. Exhibit B.
Indeed, Dr. Pirpirus seems to have kept sort of a dual report system. It appears that one set of reports deals with the 1994 motor vehicle accident. These extend at least to April, 1997 and indicates copies were sent to attorneys in Maryland or the District of Columbia. Another set of reports deal solely with the alleged Stop Shop injuries and were sent to her attorneys in this case. Exhibits 5, 6, B. This second set of reports assiduously refrains from any reference to the 1994 car accident.
Bills submitted by James Clark for physical therapy, Exhibit 1, were apparently submitted as evidence of damages in both cases. Whether these CT Page 2086 contradictions, inconsistencies, dual reports and double counting are the fault of Skelton, her medical treaters or the lawyers involved, the result is that the court cannot rely on much of the evidence produced by the plaintiff. It bears noting that Dr. Barnett, a witness for the defendant who reviewed all the medical reports, found them confusing, inconsistent and inaccurate. He concluded there was no objective evidence of any injuries to Skelton resulting from the incident on April 13, 1995.
After a review of all the evidence, the court finds that Skelton has not proved by a preponderance of credible evidence that an accidental fall occurred or that injuries resulted therefrom.
 II NOTICE
As a business operator, the defendant, Stop Shop, had a duty to use reasonable care to keep its premises in reasonably safe condition and to warn of any latent dangers. If Stop Shop had actual or constructive notice of a dangerous condition in adequate time to remedy the condition and failed to do so, it may be held liable. Morris v. King Cole Stores,Inc. 132 Conn. 489 (1946). The issue in this case involves whether Stop 
Shop had notice of the cooking syrup spill on its aisle floor in time sufficient to remedy, or warn of, the problem. Skelton produced no evidence that any store employee had actual notice of the spill. Instead, Skelton points to evidence from which one might infer that the syrup was on the floor for a sufficient length of time to conclude that Stop Shop should have known about the condition. This evidence is the testimony of Giannaras and Skelton that the syrup on the aisle floor had footprints and wheel tracks through it. Skelton's testimony at her deposition was that she saw tracks in the syrup before she fell. At trial, she testified she did not see the syrup at all until after the fall. In any event, the pictures of the aisle floor taken after the incident do not show any evidence of footprints or tracks, although the pool of syrup is visible. For the reasons stated in this paragraph and with reference to the evidence set forth above concerning the opened container of syrup found subsequently, the court holds there is not a preponderance of credible evidence that Stop Shop had notice of the alleged dangerous condition.
The court finds for the defendant and orders the complaint dismissed.
Adams, J. CT Page 2087